# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| JOI M. EACHUS, individually, and as the legal guardian of GAJB, a minor; ALVIN R. EACHUS, and STELLA L. HARRISTON-EACHUS, individually, and as the legal guardian of LME, a minor, | § § § § § § | Civil Action No. 4:20-CV-00324 Judge Mazzant |
| *Plaintiffs,* | § § § | |
| v. | § § | |
| KENNETH R. STEELMAN, MARK L. JOHNSON, AND FANNIN COUNTY, TEXAS, | § § § § | |
| *Defendants.* | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendants' Second Motion to Dismiss (Dkt. #15).  Having considered the motion and the relevant pleadings, the Court finds that the motion should be granted in part and denied in part.

## BACKGROUND

On August 9, 2018, Kenneth Steelman ("Steelman")—a Deputy Sheriff employed by Fannin County (the "County")—was dispatched to investigate a dog complaint (Dkt. #12 ¶ 16). After talking with the individual who filed the complaint, Steelman went to the home of Stella L. Harriston-Eachus ("Stella"), Alvin R. Eachus ("Alvin"), Joi M. Eachus ("Joi"), LME (a minor), and GAJB (a minor) (collectively referred to as "Plaintiffs") (Dkt. #12 ¶¶ 21–22). Joi—Stella and Alvin's daughter—answered the door after Steelman knocked and rang the doorbell (Dkt. #12 ¶ 24). Joi stepped onto the front porch where Steelman advised her that he had received

a dog complaint and asked to see the dogs, but Joi told Steelman he could not because he was not permitted to enter the house when her parents were not home (Dkt. #12 ¶¶ 26–29).

After informing Joi of the complaint and cautioning her that if more complaints were received and the dogs got out causing injury to person or property that she could be held criminally liable, Steelman asked Joi if she understood, and Joi confirmed she understood by responding with "ok" (Dkt. #12 ¶¶ 31–33). Plaintiffs allege Steelman began to walk away, thus ending the encounter with Joi after she confirmed that she understood (Dkt. #12 ¶¶ 34–35).

After walking away, however, Steelman turned back to continue talking to Joi, only to find that she had returned inside the home already (Dkt. #12 ¶¶ 36–39). Plaintiffs further allege that at this point, Steelman went back up to the door and banged on it hard enough for the door to open (Dkt. #12 ¶¶ 41–42). Frightened by Steelman's forceful entry and with both GAJB and LME around, Joi asked Steelman to "please go," to which Steelman responded, "do not turn around and run back inside like that" (Dkt. #12 ¶¶ 43–44).

Steelman then proceeded to warn Joi that the Society for the Prevention of Cruelty to Animals might get involved if there are more dog complaints (Dkt. #12 ¶ 46). At that time, two of the puppies walked past Steelman through the open door, and Steelman would not let Joi get the puppies back in the house (Dkt. #12 ¶ 48).

Joi then raised her voice to talk over Steelman and ask if she could call her parents so that he could speak with them (Dkt. #12 ¶ 49). In response, Steelman pointed his pen at her and stated, "I am fixin to take you to jail" (Dkt. #12 ¶ 49). After asking him why he was going to take her to jail, Steelman told Joi that it was "because you won't let me finish, you are interrupting me" (Dkt. #12 ¶ 50). Joi contended that Steelman could not take her to jail for not letting him talk, but he threatened that he could (Dkt. #12 ¶ 51).

Growing increasingly more frightened, Joi continued to urge Steelman to leave her home because he had no reason to be there and no right to harass her, which Plaintiffs allege caused Steelman to become more aggressive and cross the threshold of the door, thus entering the home (Dkt. #12 ¶¶ 55–56). Scared for her safety and the safety of the two minors with her, Joi asked Steelman to move from the doorway of her home so that she could walk outside to the front yard where neighbors could witness the encounter (Dkt. #12 ¶ 62). Steelman refused and continued to detain Joi and the two minors in the home (Dkt. #12 ¶ 63).

Joi was ultimately able to walk past Steelman to the front porch while Steelman remained inside the home (Dkt. #12 ¶ 68). While standing in the front yard talking on her cellphone to Stella, her mother, Joi told Steelman that she knew her rights and again told Steelman to get out of her home, to which he replied "no" (Dkt. #12 ¶¶ 67–68). Joi then went back onto the porch and pleaded with Steelman to get out of her house, which he refused to do (Dkt. #12 ¶¶ 69–70).

Joi then handed Steelman her phone and told him that Stella wanted to speak to him (Dkt. #12 ¶ 71). Stella asked Steelman why he was at her home, and Steelman replied "because your daughter, as I was trying to explain what was going to happen if these dogs continue to run free, slammed the door, and when I went to knock on it, the door opened" (Dkt. #12 ¶¶ 72–73). Stella advised Steelman that without a warrant, he was not supposed to be in her home (Dkt. #12 ¶ 75).

During the call, Joi walked in and out of the home, around the front of the home, and out of Steelman's vision (Dkt. #12 ¶¶ 73, 74, 76). While exiting the home again but still on the front porch, Joi stated "get the fuck out of my house" (Dkt. #12 ¶ 77). Upon hearing the statement, Steelman put down the phone, approached Joi, told her to "come here," and proceeded to grab at

Joi's arms and neck (Dkt. #12 ¶¶ 77–79). Fearing for her safety, Joi yelled for Steelman to stop and to leave her alone (Dkt. #12 ¶ 80).

Steelman continued to restrain her, which physically hurt Joi and choked her (Dkt. #12 ¶ 80). Even after Joi yelled that she could not breathe, Steelman continued to restrain her until another officer could arrive on the scene, which took approximately eight minutes (Dkt. #12 ¶¶ 81–83). Plaintiffs allege that Steelman's use of force to restrain Joi caused bruising and lacerations on numerous parts of her face and body (Dkt. #12 ¶ 84).

Other law enforcement officers arrived on scene and helped handcuff Joi (Dkt. #12 ¶ 85). Despite her request that she not be removed from the scene until after her significant other arrived to take custody of GAJB, the law enforcement officers refused to accommodate the request (Dkt. #12 ¶¶ 92–93). Joi was then transferred to Texoma Medical Center for medical clearance and then on to Fannin County Jail where she was held for twelve hours (Dkt. #12 ¶¶ 94, 96).

Plaintiffs allege Steelman provided a false report regarding what happened, and that "while attacking Joi, Steelman cut himself" (Dkt. #12 ¶¶ 86–91). As a result of Steelman's report, a felony criminal charge of assaulting a peace officer and a related criminal charge were filed against Joi (Dkt. #12 ¶ 95). Ultimately the charges against Joi were dismissed (Dkt. #12 ¶ 98).

On April 16, 2020, Plaintiffs filed this suit against Steelman, the County, and Mark L. Johnson ("Johnson")—the Sheriff employed by Fannin County. On July 14, 2020, Defendants filed their Second Motion to Dismiss (Dkt. #15). Plaintiffs filed their Response on July 28, 2020 (Dkt. #18).

In the Amended Complaint (Dkt. #12) Plaintiffs allege nine Counts against Defendants.

- Count I is a claim by Joi against Steelman: Fourth Amendment (Unlawful Seizure) pursuant to 42 U.S.C. § 1983.

4

- Count II is a claim by Joi against Steelman: Fourth Amendment (Excessive Force) Pursuant to 42 U.S.C. § 1983.

- Count III is a claim by Plaintiffs against Steelman: Fourth Amendment (Unlawful Search of Home) pursuant to 42 U.S.C. § 1983.

- Count IV is a claim by Joi and GAJB against Steelman: Fourteenth Amendment (Substantive Due Process) pursuant to 42 U.S.C. § 1983.

- Count V is a claim by Joi against Steelman and Johnson: First Amendment (Retaliation for Protected Speech) pursuant to 42 U.S.C. § 1983.

- Count VI is a claim by Joi against Steelman: Fourteenth Amendment (Procedural Due Process) pursuant to 42 U.S.C. § 1983.

- Count VII is a claim by Plaintiffs against Steelman: Fourth and Fourteenth Amendments (Malicious Prosecution Causing Continued Loss of Liberty) pursuant to 42 U.S.C. § 1983.

- Count VIII is a claim by Plaintiffs against Defendant Johnson: Fourth and Fourteenth Amendments (Supervisory Liability) pursuant to 42 U.S.C. § 1983.

- Count IX is a claim by Plaintiffs against Fannin County: Fourth and Fourteenth Amendments (Municipal Liability) pursuant to 42 U.S.C. § 1983.

## LEGAL STANDARD

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6).

When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). When reviewing a motion to dismiss, a district court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Funk v. Stryker Corp.,* 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This

evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

## ANALYSIS[1]

Plaintiffs bring claims against Steelman, Johnson, and the County. The Court will address the claims against each individual first before moving to the claims against the County.

Steelman and Johnson first argue that they are protected by qualified immunity and assert that "Plaintiffs have not plead facts and a cause of action that will overcome this qualified immunity" (Dkt. #15 at p. 2). Defendants summarize their Motion to Dismiss as follows: (1) Stella, Alvin, GAJB, and LME, "and all their claims should be dismissed since they had no physical

---

[1] Defendants' first issue presented asks "[w]hether there are recognized claims upon which relief can be granted by [Stella, Alvin], GAJB and LME, since they had no physical contact with Steelman, were not taken into custody, suffered no actual or compensable injury and were not actively involved in the actual events?" (Dkt. #15 at p. 6). In their Motion to Dismiss, Defendants assert that Alvin, Stella, GAJB, and LME do not have standing to bring claims because they are "essentially asserting a bystander claim" (Dkt. #15 at p. 33). The Court will address the plausibility of Plaintiffs' claims throughout the opinion but will now briefly address Defendants' assertion that Alvin, Stella, GAJB, and LME are bringing bystander claims and that they are just bringing "tag-on claims" (Dkt. #15 at p. 33).

To begin, Defendants assertion that Alvin, Stella, GAJB, and LME are "essentially" bringing bystander claims is so basic and conclusory that the issue is not even properly briefed for the Court to decide. Defendants spend all of two paragraphs setting out this argument, but without more, the Court cannot fully address Defendants' first issue presented, which Defendants mention as more of an afterthought rather than the first issue to be decided.

Contrary to Defendants' mischaracterization of the claims, Plaintiffs have brought claims for rights of their own and not just for violations of Joi's rights. By way of example, Plaintiffs all bring a claim in Count III for the unlawful search of the home. Under the Fourth Amendment, Plaintiffs all have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches . . . ." U.S. CONST. amend. IV. Each plaintiff has this right—not just Joi.

Defendants claim that Alvin, Stella, GAJB, and LME cannot bring their claims because they cannot recover for resulting emotional injuries under § 1983 as a bystander who is not the object of police action (Dkt. #15 at p. 33). As discussed above, Defendants have mischaracterized Alvin, Stella, GAJB, and LME's claims as bystander claims instead of acknowledging that each individual alleges violations of rights they personally have. Further, Alvin, Stella, GAJB, and LME are not seeking to only recover emotional damages. Defendants' mischaracterization and misreading of Plaintiffs' claims does not give rise to a valid defense. Consequently, the argument is not properly briefed for the Court's consideration, and thus Court rejects Defendants' argument that Alvin, Stella, GAJB, and LME do not have standing to bring claims and that their claims are bystander claims.

contact with Steelman, were not taken into custody, suffered no actual or compensable injury and were not actively involved in the actual events"; (2) Fannin County, Texas, "is entitled to dismissal of all claims asserted against it as there is no showing that the events in question were the result of any official policy, practice or custom. As such, there is no basis for any municipal (county) liability under 42 U.S.C. § 1983"; (3) "Sheriff Johnson is entitled to dismissal of all claims asserted against him individually based upon his qualified immunity and lack of any proper basis for supervisory liability"; (4) "Deputy Steelman is entitled to dismissal of all claims asserted against him individually based upon his qualified immunity. His actions were seeking to investigate a dog complaint and deal with Joi Eachus' actions in escalating the situation, which are protected under the doctrine of qualified immunity"; and (5) "Plaintiffs have failed to state a claim upon which relief can be granted (Dkt. #15 at pp. 8–9). The Court will begin by addressing the claims brought against Steelman.

## I.      Section 1983 Claims Against Steelman

"Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (citation and internal quotation marks omitted); *see also* 42 U.S.C. § 1983. "[T]here can be no § 1983 liability" unless a plaintiff has "suffered a constitutional violation . . . at the hands of . . . a state actor." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 867 (5th Cir. 2012) (en banc).

Accordingly, for a § 1983 claim to survive a motion to dismiss under Rule 12(b)(6), "the plaintiff must allege that (1) a state actor, i.e., a person or entity acting under color of state law, (2) deprived the plaintiff of a federal constitutional right." *Reitz*, 2017 WL 3046881, at *11; *accord Calhoun v. Mejia*, No. A-08-CA-135-SS, 2008 WL 11411254, at *3 (W.D. Tex. May 20, 2008)

8

(quoting 42 U.S.C. § 1983). And when a "motion to dismiss raises the defense of qualified immunity, the plaintiff 'must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm . . . alleged and that defeat a qualified-immunity defense with equal specificity.'" *McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017) (quoting *Zapata v. Melson*, 750 F.3d 481, 485 (5th Cir. 2014)), *cert. denied*, 138 S. Ct. 739 (2018).

Public officials whose positions entail the exercise of discretion may be protected by the defense of qualified immunity from personal liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant asserts qualified immunity and establishes that the alleged actions were conducted pursuant to the exercise of discretionary authority, the burden then shifts to the plaintiff to rebut this defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

Courts have historically conducted a two-pronged analysis to determine whether a defendant is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, a court must determine whether a "constitutional right would have been violated on the facts alleged." *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004). Second, if a constitutional right was violated, a court then determines whether "the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*

A law is "clearly established" if a reasonable official would understand that his or her conduct violates the asserted right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The official's subjective motivation is irrelevant to the qualified-immunity defense, except as far as it is relevant to the underlying constitutional claim. *Crawford-El*, 523 U.S. at 588. The clearly established inquiry does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *See id.*; *Malley v. Briggs*, 475 U.S. 335,

341 (1986). The Supreme Court instructs courts "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009).

### a. Search and Seizure

### i.   Was There a Constitutional Right Violated?

Plaintiffs bring claims for unlawful search and seizure in Counts I and III of the Amended Complaint. "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). "Arrests and other detentions may qualify as seizures under the Fourth Amendment." *Ashcroft*, 563 U.S. at 735 (arrest); *Peterson v. City of Fort Worth*, 588 F.3d 838, 845 (5th Cir. 2009) (detention). In addition, a "'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

Here, Plaintiffs allege Steelman violated their right to be free from unlawful searches and that he violated Joi's right to be free from unlawful seizures.  The "circumstances of a search and seizure carried out in a home necessarily include the officer's entry into the home." *Trent v. Wade*, 776 F.3d 368, 378 (5th Cir. 2015). "Courts consider 'the method of an officer's entry into a dwelling' when 'assessing the reasonableness of a search or seizure[,]' and the reasonableness of the method of entry 'may depend in part on whether law enforcement officers announced their

presence and authority prior to entry.'" *Reitz,* 2017 WL 3046881, at *19 (citing *Wilson v. Arkansas*, 514 U.S. 927, 931, 934 (1995)).

Steelman began his encounter with Joi by knocking on the door and discussing the dog complaint with her on the porch of the home. At this point, the encounter was consensual. Joi then retreated into the house on belief the encounter was over, at which point Steelman reengaged Joi by heading back onto the porch and knocking on the door hard enough to open it. (Dkt. #12 ¶¶ 35–42). Plaintiffs allege that Steelman's forced entry into the home frightened Joi to the point that she felt she could not leave, which would be a display of authority constituting a seizure.

Despite Joi walking between rooms and ultimately out of the house, she would have been "seized" for Fourth Amendment purposes because Steelman—an officer—"by mean of physical force or show of authority [had] in some way restrained the liberty of a citizen." *Terry*, 392 U.S. at 19 n.16. A seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [they were] not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "The reasonable-person test is objective and ensures 'that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual' claiming a violation." *McLin*, 866 F.3d at 691 (citing *Chesternut*, 486 U.S. at 574). "Physical force is not required to effect a seizure; however, absent physical force, '*submission* to the assertion of authority' is necessary." *Id.* (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).[2]

With an officer in her home as well as two minor children, Joi certainly would not have felt as if she could grab her wallet, go to the supermarket to run errands, and continue on with

---

[2] "Thus, seizures have been found when an encounter is precipitated by a show of authority, such as when a siren was used to pull a motorist over; when a motorist stepped out of his camper, with his hands up, in response to an officer's knock on the camper door; or when under other circumstances it was 'apparent . . . that the individual was not free to ignore the officer and proceed on his way.'" *United States v. Elmore*, 595 F.2d 1036, 1041 (5th Cir. 1979).

her day. Not only did Joi not feel like she could leave the situation, but an objectively reasonable person would have felt the same way after an officer opened the door and entered the home uninvited.

Additionally, "[w]arrantless seizures of a person inside his home are 'presumptively unreasonable.'" *United States v. Watson*, 273 F.3d 599, 602 (5th Cir. 2001) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). A seizure under such circumstances can be justified only by exigent circumstances or consent. *Id.* The burden is on the officer to show that such a warrantless seizure is justified. *Payton*, 445 U.S. at 586 n.25. Because this restriction of liberty constitutes a seizure, Steelman must prove the warrantless seizure he conducted inside the home was justified. At the Rule 12(b)(6) stage, however, Defendants are not able to put on evidence to rebut the assertions in the pleadings.

In their Second Motion to Dismiss, Defendants assert that the Amended Complaint has facts sufficient to show the seizure was justified. Defendants claim that while Steelman was investigating the dog complaint, Joi admitted the dogs had escaped before, thus creating "reasonable suspicion and probable cause in support of the matter under investigation" (Dkt. #15 at p. 26). However, Defendants' recitation of the facts run counter to the Amended Complaint, which is what the Court's review is limited to when deciding a Motion to Dismiss. The Court must accept as true all well-pleaded facts in Plaintiffs' Amended Complaint and view those facts in the light most favorable to Plaintiffs. According to the Amended Complaint, Joi confirms that she understands the repercussions that could follow if the dogs got out and caused damage, but she did not admit that the dogs had escaped before (Dkt. #12 ¶¶ 25–34).

Defendants then claim the situation escalated when Joi went inside and shut the door while Steelman was "still conducting his investigation" (Dkt. #15 at pp. 26–27). Again, this assertion

runs counter to the Amended Complaint. Plaintiffs asserted Steelman had ended the encounter when he walked away and not that he was still conducting his investigation after he walked away (Dkt. #12 ¶ 35).

Defendants do raise the point that detentions can be based on investigative purposes and to secure the scene and that a "knock and talk" can ripen into the development of probable cause and even into a warrantless search and seizure (Dkt. #15 at pp. 26–27). But here, the detention was not necessary for investigative purposes and to secure the scene. In *Lincoln v. Scott*, the officers removed a witness to secure the scene in an effort to protect the witness while responding to a shooting incident. 887 F.3d 190, 192, 197 (5th Cir. 2018). SWAT team members immediately secured the scene to ensure the shooter could not access his firearm, and the officers removed the witness to provide medical assistance to the shooting victim and for the witness's safety from the shooter. *Id*. at 193.

The facts here are distinguishable. In *Lincoln*, a violent crime had been committed, not a complaint about dogs on the loose. Further, at the point in the interaction when Steelman reengaged Joi by banging open the door and stepping into her home, further investigation was unnecessary. Steelman arrived on scene to warn the residents of the home of the dog complaint. At the time Steelman turned to leave the house, no dogs were still running through the neighborhood off the leash, and there was no ongoing infraction to investigate. Though a detention may be reasonable when arriving to the scene of a shooting, the same cannot be said for a dog complaint.

In addition, the "knock and talk" interaction ended by the time Joi returned inside her home. After receiving the complaint, Steelman was well within his right to knock on Joi's door and ask her if she would answer a few questions, which she did. Joi consented and stepped onto the porch to talk with Steelman. After Joi returned inside the home, the consensual interaction was over.

13

When Steelman banged open her door, however, his actions no longer fell under the term of "knock and talk." Joi had not agreed to let Steelman into her home and even asked for him to leave.

Even assuming the original consensual "knock and talk" engagement had not ended when Joi went back inside, nothing about the circumstances indicated the "knock and talk" had ripened into the development of probable cause and even into a warrantless search and seizure. A "knock and talk" visit can ripen into probable cause when officers see a gun, *United States v. Jones,* 239 F.3d 716, 720–22 (5th Cir. 2001), or when officers can smell marijuana during the "knock and talk" visit, *United States v. Tobin,* 923 F.2d 1506, 1512 (11th Cir. 1991). Nothing about Joi returning into her home and closing the door created exigent circumstances justifying Steelman banging open the door and entering the home for a warrantless search and seizure, effectively detaining Joi.

Under the facts alleged in the Amended Complaint, Plaintiffs have stated a plausible claim for an unreasonable search and seizure against Steelman. According to the Amended Complaint, Steelman had no warrant, probable cause, exigent circumstances, or consent to enter her house; nor did Steelman have consent to search the home, or seize, detain, or arrest Joi. Consequently, based on the facts in the Amended Complaint, Plaintiffs have stated a plausible claim that Steelman violated Plaintiffs' constitutional rights.

### ii.   Was There Clearly Established Law for the Search?

"Under the Fourth Amendment, a warrantless search of a person's home is presumptively unreasonable, and it is the government's burden to bring the search within an exception to the warrant requirement." *United States v. Aguirre*, 664 F.3d 606, 610 (5th Cir. 2011); *Payton*, 445 U.S. at 586. Exigent circumstances are an exception to the warrant requirement. *See Aguirre*, 664 F.3d at 610.

Steelman would have known that a warrantless entry into a private dwelling without exigent circumstances is unlawful, and thus the search would have been unlawful. At the Rule 12(b)(6) stage, looking only to the pleadings, Defendants are unable to show that exigent circumstances existed. Thus, without showing that some exception applies, Steelman violated a clearly established law.

Although Defendants may disagree with Plaintiffs' recitation of the facts, motions to dismiss limit factual considerations to the Plaintiffs' allegations. Here, Plaintiffs' alleged facts are not conclusory, and without the ability to view evidence, the Court must view the alleged facts as true. A motion for summary judgment is a better vehicle to develop the record after both sides thoroughly presented, and consequently a motion for summary judgment is a more apt way to consider issues like qualified immunity. A motion to dismiss simply falls short in various situations, but that is the procedural vehicle Defendants chose to present their qualified-immunity defense.

Accordingly, the Court finds that—at the Rule 12(b)(6) motion to dismiss stage—Steelman is not entitled to qualified immunity for his search of the home.

### iii.    Was There Clearly Established Law for the Seizure?

"Warrantless seizures of a person inside his home are 'presumptively unreasonable.'" *Watson*, 273 F.3d at 602 (citing *Payton,* 445 U.S. at 586). Only exigent circumstances or consent justify such an arrest. *Id.* (citing Payton, 445 U.S. at 583). By contrast, an arrest outside a suspect's home is justified if the arresting officers had "reasonable grounds" to believe that the suspect had committed a felony. *Id.* at 602 (citing *United States v. Watson,* 423 U.S. 411, 417 (1976)). "Probable cause for a warrantless arrest exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person

to conclude that the suspect had committed or was committing an offense." *Id.* (citing *United States v. Wadley,* 59 F.3d 510, 512 (5th Cir. 1995)).

Joi's seizure can be broken down into two parts. The first part of the seizure would be when Steelman entered Joi's home and, through show of force, restrained her liberty. And then the second part would be when Steelman wrestled Joi to the ground in the front yard. Defendants, however, do not break down their seizure analysis this way. By banging open Joi's door and restraining her liberty in the home, Steelman effectively seized Joi, which would violate clearly established law. Further, there were no reasonable grounds to believe Joi had committed a felony, and thus her seizure outside the home would also violate clearly established law. At the Rule 12(b)(6) stage, Defendants cannot put on evidence to show that an exigent circumstance existed. Accordingly, the Court finds that, at this point, Steelman is not entitled to qualified immunity for his seizure of Joi.

### b. Excessive Force

#### i.      Was there a constitutional right violated?

In Count II of the Amended Complaint, Joi brings an excessive force claim against Steelman. The Fourth Amendment creates a "right to be free from excessive force during a seizure." *Trammell v. Fruge*, 868 F.3d 332, 339–40 (5th Cir. 2017) (citing *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); *see* U.S. CONST. amend. IV. To prevail on an excessive-force claim, Joi must show "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012)). "The second and third elements collapse into a single objective reasonableness inquiry, guided by the following *Graham* factors: 'the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Peña v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018) (citation omitted) (quoting *Graham,* 490 U.S. at 396).

Starting with the first prong, Defendants do not contest that Joi was injured. In their Motion to Dismiss, Defendants admit "the test in this case will be the reasonableness of the situation" (Dkt. #15 at p. 28). Thus, the only question for the Court to address is whether Steelman's conduct was objectively unreasonable.

In excessive-force claims, the reasonableness of an officer's conduct depends on "the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. The "reasonableness" of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. As such, the Court's inquiry is "whether the officer['s] actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Cooper*, 844 F.3d at 522 (alterations in original) (quoting *Graham*, 490 U.S. at 397).

Defendants argue Steelman's actions were reasonable given the circumstances because he "used nothing more than open hand restraint to grab Joi Eachus when she attempted to evade him[,]" Joi "physically resisted" Steelman when he tried to "place her in handcuffs," and that when "Steelman was unable to handcuff her, and when he tried to reduce his level of force, Joi Eachus would increase her resistance and attempt to escape" (Dkt. #15 at p. 29). Again, at the Rule 12(b)(6) stage, the Court limits its review of that facts to those contained in the Amended Complaint and viewed in the light most favorable to Plaintiffs. Here, Plaintiffs contend the force Steelman used on Joi was disproportionately excessive to the need and that her right to be free

from such force was clearly established. Accordingly, Plaintiffs argue Steelman is not entitled to qualified immunity.

"The test used to determine whether a use of force was reasonable under the Fourth Amendment 'is not capable of precise definition or mechanical application.'" *Trammell,* 868 F.3d at 340 (citing *Graham*, 490 U.S. at 396). Rather, "its proper application requires careful attention to the facts and circumstances of each particular case, including" (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id*.

To begin, there was no crime at issue—no crime at all. The entire encounter began after a neighbor called in a complaint about Plaintiffs' dogs. A dog complaint is not a crime. Because there was no crime, the first factor in determining reasonableness weighs against Steelman's use of force.

The second factor is neutral. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. As the Supreme Court noted in *Graham*, not every push or shove violates the Fourth Amendment. *Id*. at 396. Steelman confronted Joi at the threshold of her home, and in doing so two dogs approached Steelman (Dkt. #12 ¶ 47); Joi walked in and out of the rooms in her home (Dkt. #12 ¶ 57); there were other individuals inside the home whose age and presence Steelman would not have been aware of (Dkt. #12 ¶ 53); and then immediately before Steelman touched Joi, she addressed him with explicit language (Dkt. #12 ¶ 77). It is difficult—based on the Amended Complaint alone—to determine whether

Steelman perceived Joi as posing a threat to his safety. Steelman's action of calling another sergeant or lieutenant to respond indicates that he could have perceived the possibility of danger (Dkt. #12 ¶ 56). However, Plaintiffs did assert that Steelman "did not express any concern for his safety" when the two puppies walked toward him (Dkt. #12 ¶ 47). Because there are assertions that could be construed both ways, the Court finds the second factor is neutral.

The third factor weighs against finding Steelman's actions as reasonable. To start, Steelman went to the Eachus household in response to a dog complaint, not a 9-1-1 emergency call. Based on the Amended Complaint, it does not appear Steelman arrived with the intention to arrest anyone. Rather, after the consensual conversation ended and Steelman reengaged Joi by banging open the door, the confrontation escalated, leading Steelman to grab Joi and ultimately pin her to the ground. Until laying hands on Joi, it would not have been apparent to her that she was going to be arrested, and none of her actions indicated she was resisting or fleeing arrest.

Further, "where an individual's conduct amounts to mere 'passive resistance,' use of force is not justified." *Trammell*, 868 F.3d at 342; *see also Hanks v. Rogers*, 853 F.3d 738, 746 (5th Cir. 2017) (determining the plaintiff's initial refusals to follow a police officer's instructions amounted to, "at most, passive resistance," and did not justify the officer's use of a "'half spear' takedown" against the plaintiff); *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (plaintiff's refusal to get out of her car before her husband arrived on the scene constituted passive resistance). Similar to *Trammell*, "[i]t is unclear at what point passive resistance becomes the sort of active resistance which justifies force." 868 F.3d at 341 (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000)). The Fifth Circuit summarized *Goodson* as follows:

> For example, in *Goodson*, two police officers stopped the plaintiff, believing that he matched the description of an individual suspected of assault. [202 F.3d at 733]. One of the police officers instructed the plaintiff to "put his hands on the [police] car." *Id.* at 734. The plaintiff claimed that before he could comply the officer

grabbed his arm. *Id.* The plaintiff "stated that he pulled his arm away from [the officer] in surprise and stumbled back in an attempt to regain his balance and maintain a little distance from the police officers." *Id.* Thereafter, the plaintiff claimed the two officers together tackled him to the ground. *Id.* In reversing the district court's summary judgment based on qualified immunity, this Court held that a fact question "exist[ed] as to the objective reasonableness of the force used" under the circumstances. *Id.* at 740. The Court did not describe the plaintiff's decision to pull his arm away from the officer as resistance. *Id.* And given that the officers lacked reasonable suspicion to detain or frisk the plaintiff and that the plaintiff was not fleeing, the Court declined to conclude that the plaintiff's decision to pull away from the officers justified the amount of force used. *Id.*

*Trammell,* 868 F.3d at 341.

Similar to *Trammell* and *Goodson*, based on the pleadings, it appears Joi's only physical resistance was her attempt to resist Steelman grabbing her arm and her attempts to scream for help. Looking from Plaintiffs' perspective at the Rule 12(b)(6) stage, the Court does not find Joi was resisting arrest to the point where Steelman's use of force was reasonable.

Therefore, the Court holds that Joi has stated a plausible claim alleging a violation of her constitutional right to be free from excessive force.

### ii.    Was There Clearly Established Law for the Excessive Force?

The Court next turns to whether the law at the time of Joi's arrest was clearly established. The Court concludes that it was. The facts of this case are similar to those in *Goodson* because the officers in *Goodson* lacked reasonable suspicion to detain and frisk the plaintiff in the first place. 202 F.3d at 740. The law at the time of Joi's arrest clearly established that it was objectively unreasonable for Steelman to tackle and pin an individual to the ground who was not fleeing, not violent, only used strong language, and only—at most—passively resisted arrest. Accordingly, the Court finds Steelman is not entitled to qualified immunity for his use of force at this early stage of the litigation.

### c.   Counts V, VI, and VII Against Steelman

Plaintiffs bring three related claims: Count VI for a violation of Joi's procedural due process rights; Count VII for malicious prosecution; and Count V for violations of Joi's First Amendment rights. In Count VI, Joi claims Steelman "knowingly provided a false report to law enforcement regarding the incident" (Dkt. #12 ¶ 186). In Count VII, Plaintiffs claim that Steelman "provided a false statement to law enforcement, which he knew would result in the filing of criminal charges against Joi" (Dkt. #12 ¶ 193). And in Count V, Joi claims she was arrested in retaliation for criticizing Steelman's conduct and using explicit language (Dkt. #12 ¶ 177). The Court will address these claims together insofar as all three are derived from the same incident.

### i.      Malicious Prosecution

The Supreme Court has not defined the elements of a constitutional malicious prosecution action under § 1983. *McDonough v. Smith*, 139 S. Ct. 2149, 2156 n.3 (2019). In the Fifth Circuit, however, the elements are generally as follows: "(1) the commencement of a criminal prosecution against the plaintiff; (2) causation (initiation or procurement) of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff." *Vine v. PLS Fin. Servs., Inc.*, 226 F. Supp. 3d 719, 728 (W.D. Tex. June 6, 2016), *aff'd*, 689 F. App'x 800 (5th Cir. 2017) (citing *Davis v. Prosperity Bank*, 383 S.W.3d 795, 802 (Tex. App.–Houston [14th Dist.] 2012, no pet.)).

In Count VII, Joi claims she should be free from malicious prosecution.[3] In *Castellano v. Fragozo*, the Fifth Circuit held that "no . . . freestanding constitutional right to be free from malicious prosecution exists." 352 F.3d 939, 945 (5th Cir. 2003) (en banc); *see id.* at 953

---

[3] Though Plaintiffs bring Count VII as a whole, based on the pleadings and the nature of the claim, Count VII for malicious prosecution only applies to Joi.

("[C]ausing charges to be filed without probable cause will not without more violate the Constitution. So defined, the assertion of malicious prosecution states no constitutional claim."). The Fifth Circuit explained, however, that "[t]he initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued." *Id.* at 953. These claims of "lost constitutional rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983." *Id.* at 953–54. Therefore, under *Castellano,* "the claimant must allege that officials violated specific constitutional rights in connection with a malicious prosecution." *Cuadra v. Hous. Indep. Sch. Dist.,* 626 F.3d 808, 812 (5th Cir. 2010) (internal quotation marks omitted) (citing *Castellano,* 352 F.3d at 945); *see also Deville,* 567 F.3d at 169 ("[I]t must be shown that the officials violated specific constitutional rights in connection with a 'malicious prosecution.'").

Joi claims "[t]he initiation of criminal charges without probable cause, which results in a deprivation of liberty, is a constitutional injury." (Dkt. #12 ¶ 192). And Joi brings this claim in association with her claim in Count I for unlawful seizure. As such, the claim in Count VII is not a freestanding claim. Further, the Fifth Circuit has recognized that "[p]retrial detention[s] constitute[] a 'seizure' within the meaning of the Fourth Amendment." *Whittington v. Maxwell*, 455 F. App'x 450, 458 (5th Cir. 2011); *see Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 844 (1998) ("[A] Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied.") (internal quotation marks and emphasis omitted); *see also Albright v. Oliver,* 510 U.S. 266, 274 (1994) (plurality opinion)

("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

"With regard to pretrial confinement, '[t]he sole issue [under the Fourth Amendment] is whether there is probable cause for detaining the arrested person pending further proceedings.'" *Whittington*, 455 F. App'x at 458 (5th Cir. 2011) (citing *Gerstein v. Pugh,* 420 U.S. 103, 120 (1975)). "Prolonged pretrial incarceration without probable cause . . . constitutes a cognizable deprivation of liberty under the Fourth Amendment." *Id*.

In the Amended Complaint, Plaintiffs allege "[Steelman] provided a false statement to law enforcement, which he knew would result in the filing of criminal charges against [Joi]" (Dkt. #12 ¶ 193).  Plaintiffs claim that "[a]s a direct result of [Steelman's] false statement to law enforcement, [Joi] was detained in jail for approximately 12 hours" (Dkt. #12 ¶ 96). Plaintiffs further assert that "[t]he criminal charges were filed without the requisite probable cause[,]" "[a]s a result of [Joi's] innocence, the charges were dismissed[,]" and that as a result of Steelman's actions, Joi has suffered harm (Dkt. #12 ¶¶ 194–198).

Based on Plaintiffs' pleadings, there is a genuine question of whether Steelman's report was false leading to the criminal charges. Plaintiffs have alleged that after other law enforcement officers arrived at the house, Steelman told the sergeant that he called the sergeant when he decided to detain Joi (Dkt. #12 ¶¶ 85–87). Plaintiffs bolster assertion that this was a false statement by claiming "the video establishes that [Steelman] called the sergeant a full two minutes before he attempted to physically restrain [Joi], and during that time, he permitted [Joi] to enter and leave the home, and walk out of his field of vision" (Dkt. #12 ¶ 88).

As discussed above, Steelman's search, seizure, and use of force were unreasonable given that no crime had been committed. He forcibly entered Joi's home without a warrant, seized and

arrested her without probable cause, and used excessive force to effectuate the seizure. All of these actions harmed Joi.

At this stage of the litigation, Joi has alleged, in connection with her malicious prosecution claim, a plausible claim for a violation of her Fourth Amendment right to be free from illegal search and seizure and her Fourteenth Amendment procedural due process rights.

### a. Was There Clearly Established Law?

The Court now turns to the second inquiry of the qualified immunity analysis—whether Steelman acted in an objectively unreasonable manner in the light of clearly established law. "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007). "To determine whether a reasonable officer would have believed that his or her conduct conformed to the constitutional standard, courts look at the state of the law at the time of the incident." *Voss v. Goode*, 954 F.3d 234, 239 (5th Cir. 2020), *cert. denied*, No. 20-50, 2020 WL 6385793 (U.S. Nov. 2, 2020). "The Supreme Court has not required a case 'directly on point for a right to be clearly established,' but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id*. (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). Stated differently, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 10 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

The Texas Penal Code provides, "[a] person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with . . . a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." TEX. PENAL

CODE ANN. § 38.15(a)(1). Speech alone is not sufficient to violate the statute. *Id*. § 38.15(d) ("It is a defense to prosecution under this section that the interruption, disruption, impediment, or interference alleged consisted of speech only."). Though arguing with a peace officer would be insufficient, "ma[king] physical contact with any of the officers or physically obstruct[ing]" them from performing their legally authorized duties could constitute interference. *Freeman*, 483 F.3d at 414. And "fail[ing] to comply with an officer's instruction, made within the scope of the officer's official duty and pertaining to physical conduct rather than speech" can also constitute interference. *Voss*, 954 F.3d at 239 (citing *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017)).

Here, a reasonable officer would not have believed probable cause existed to arrest Joi in the front yard of her home after she did not comply with his command to "come here" (Dkt. #12 ¶ 79). Steelman went to the home to investigate a dog complaint—not a crime. He had effectively ended the consensual interaction after he turned to leave and stepped off the porch of the home. After reengaging and banging open the door, Steelman was not justified in his actions. A reasonable officer would not have believed Joi was obstructing him or her from performing his or her duties because the investigation of the dog complaint had ended. A reasonable officer would not have reengaged Joi by banging open her door, nor would a reasonable officer have grabbed Joi when she became upset with the officer's unwelcomed presence in her home.

Though at some point the physical contact began resulting in Steelman having injuries to his mouth and the side of his head showing there had been at least some level of resistance (Dkt. #12 ¶¶ 89, 91), his actions were not reasonable under the circumstances. As Plaintiffs allege, Steelman "was the physical aggressor and the only person who had engaged in unlawful conduct . . ." (Dkt. #12 ¶ 85). Consequently, Steelman was not justified in detaining Joi, nor was he justified in filing a police report that led to criminal charges without probable cause.

Joi's subsequent arrest and detention run afoul of the Fourth and Fourteenth Amendments. Because Steelman's actions in filing the report were not reasonable, he is not entitled to qualified immunity for the procedural due process claim under Count VI and malicious prosecution claim under Count VII against him.

### ii.    First Amendment Claim Against Steelman

In Count V of the Amended Complaint, Joi brings a claim against Steelman and Johnson for violating her First Amendment rights. There are two distinct incidents for each individual, so the Court will address the allegations against Johnson separately.

Joi's alleges Steelman arrested her for criticizing his conduct and using explicit language to address him (Dkt. #12 ¶ 177). This claim directly overlaps with Counts VI and VII discussed above. Plaintiffs even alleges under Count V that "[i]n response [to Joi criticizing Steelman, he] physically attacked and seized [Joi], caused [Joi]'s continued detention, caused [Joi] to be separated from her infant child, and caused false criminal charges to be filed against her" (Dkt. #12 ¶ 178). Joi claims her speech criticizing Steelman was protected speech.

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id*. (citing *Hartman,* 547 U.S. at 256).

For a retaliation claim under the First Amendment, to prevail, Joi must establish that (1) she "engaged in a constitutionally protected activity"; (2) Steelman's actions caused Joi "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity";

and (3) Steelman's "adverse actions were substantially motivated against" Joi's exercise of constitutionally protected speech. *Keenan v. Tejeda,* 290 F.3d 252, 258 (5th Cir. 2002).

"To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Id.* (citing *Hartman,* 547 U.S. at 259). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.*

Further, the Fifth Circuit has recognized that "[t]o prevail on a First Amendment retaliation claim, [] plaintiffs must plead and prove the absence of probable cause." *Roy v. City of Monroe*, 950 F.3d 245, 255 (5th Cir. 2020) (citing *Nieves*, 139 S. Ct. at 1725).[4] As discussed above, Steelman did not have probable cause to arrest Joi, and Joi suffered harm due to her detention. The question remains whether there was a causal connection between Steelman's retaliatory animus and Joi's subsequent injury.

"[B]ecause probable cause speaks to the objective reasonableness of an arrest, its absence will . . . generally provide weighty evidence that the officer's animus caused the arrest, whereas the presence of probable cause will suggest the opposite." *Nieves,* 139 S. Ct. 1724 (internal citation omitted). Plaintiffs have alleged that Steelman felt disrespected when Joi went back inside her home, which led him to bang open the door and thus began the seizure (Dkt. #12 ¶ 40). Plaintiffs further allege that at the point when Steelman forced his way into the home, he knew that no probable cause existed because there was no ongoing crime, and for his entire time at the

---

[4] In *Nieves,* the Supreme Court stated "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." 139 S. Ct. at 1727. Plaintiffs have not argued that this case falls within the exception, nor is there anything in the Amended Complaint or Response to suggest such a conclusion.

Eachus house, there had not been a crime. The absence of probable cause indicates that—as Plaintiffs alleged—Steelman's decision to seize and arrest Joi was made as retaliation of him feeling disrespected by Joi's protected actions and words. Therefore, Plaintiffs have stated a plausible claim for retaliatory arrest against Steelman.

### a.   Qualified Immunity

The Court now turns to the question of qualified immunity. The law is clearly established that individuals have a First Amendment right to criticize the police. Joi's use of explicit language and criticizing Steelman was not sufficient to warrant an arrest, and her language did not constitute fighting words. *See City of Hous. v. Hill,* 482 U.S. 451, 461–63 (1987). Telling Steelman to "get the fuck out of my house" in response to him unlawfully entering her home and threatening to take her to jail does not rise to the level of fighting words. The Supreme Court has held "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers[,]" and even stated "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.*

The pleadings have established that Joi's speech was constitutionally protected, that her arrest for cursing a deputy was an injury that would chill the speech of a person of ordinary firmness, and that Steelman's decision to arrest Joi was motivated against her exercise of protected speech. *See Keenan,* 290 F.3d at 258–61. Further, based on the pleadings, it would have been clear to any reasonable officer that Steelman's conduct was unlawful because "government retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable," and there does not appear to be a legitimate ground to arrest Joi. *See id.* at 261–62.

Thus, Steelman is not entitled to qualified immunity for the claim in Count V of the Amended Complaint.

### d.  Substantive Due Process Rights Claim Against Steelman

In Count IV, Plaintiffs claim Steelman violated both Joi and GAJB's substantive due process rights under the Fourteenth Amendment when Steelman deprived Joi of a fundamental liberty interest as a result of him arresting her. Plaintiffs assert that "[o]ne of 'the fundamental liberty interests' recognized by this Court is the 'interest of parents in the care, custody, and control of their children.'" (Dkt. #12 ¶ 167) (first citing *Troxel v. Granville,* 530 U.S. 57, 65–66 (2000) (plurality opinion); and then citing *Littlefield v. Forney Ind. Sch. Dist.*, 268 F.3d 275, 288 (5th Cir. 2001)). Defendants assert that the claim in Count IV against Steelman should be dismissed based on his qualified immunity.

The Court needs not address whether a constitutional right would have been violated given these facts because an officer in Steelman's position "would have believed that [his] conduct conformed to the constitutional standard in light of the information available to [him] and the clearly established law." *Goodson*, 202 F.3d at 736. Plaintiffs cite to *Troxel* and *Littlefield* to support its position that Steelman violated Joi and GAJB's substantive due process rights when he arrested her and separated the two of them which prevented Joi from having "access to [GAJB], [] touch[ing] him, comfort[ing] him, breastfeed[ing] him, and otherwise car[ing] for him" (Dkt. #12 ¶ 168).

*Troxel,* however, is a case about the visitation rights of grandparents for a child born out of wedlock, *Troxel*, 530 U.S. at 67, and *Littlefield* is a case regarding parents' challenge to the constitutionality of a school's uniform policy. *Littlefield,* 268 F.3d at 289. Though both cases mention that parents have a "fundamental liberty interest in the care, custody, and management of

their children[,]" *Troxel*, 530 U.S. at 62, the cases do not discuss any right a parent has to touch, comfort, or breastfeed his or her child. Plaintiffs do not cite to any case that supports this proposition, nor is the Court aware of any law that is clearly established to support any right Joi would have to breastfeed her child after being arrested.

Without any clearly established law, the Court finds that Steelman could have reasonably believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law at the time of the arrest. Therefore, Plaintiffs have failed to state a plausible claim against Steelman for substantive due process violations.

## II.    Sheriff Johnson

The Court now shifts its focus to the claims against Johnson. Plaintiffs sue Johnson in his individual capacity, (Dkt. #21 ¶ 10), alleging he is liable for supervisory liability pursuant to § 1983 (Count VIII) for violations of Joi's Fourth and Fourteenth Amendment rights (Dkt. #12 ¶¶ 200–16), and for retaliation for protected speech pursuant to § 1983 (Count V) for violating Joi's First Amendment rights (Dkt. #12 ¶ 172–84). The Court will address the supervisor-liability claim separately from the First Amendment claim.

### a.  Supervisor Liability

Plaintiffs' supervisor-liability claims are based on Johnson's "implement[ation] or fail[ure] to implement . . . policies, training, and supervision, which were the moving force that caused [Joi's] constitutional injuries"; and that Johnson "enforced a policy that authorized the unlawful forced entry into the home"; "enforced a use of force policy that authorized the unlawful force used by [Steelman]"; "enforced a policy that authorized [Steelman's] unlawful statement to law enforcement"; "enforced a policy that authorized the retaliatory conduct"; "knew that [Steelman] provided a false statement to law enforcement but failed to discipline or criminally charge

[Steelman]"; "through repeated failures of oversight and deliberate indifference, fostered an environment where deputies felt comfortable (a) using excessive force on video for department policymakers to observe, and (b) making false statements to law enforcement"; and "shut down the Fannin County Sheriff's Office's website (a public venue for protected speech) in an attempt to silence public criticism of his department instead of owning the problem and pledging to fix it" (Dkt. #12 ¶¶ 204–13).

Plaintiffs further allege that "[a]n objectively reasonable sheriff, i.e., a sheriff acting in accordance with state and federal law, local and national training standards, and the Fannin County Sheriff's Office's policies and procedures, would have known that maintaining deficient policies and training, pursuing false criminal charges, publishing false statements, and engaging in retaliatory conduct, would violate clearly established law" (Dkt. #12 ¶ 214). Plaintiffs claim that "[a]s a direct and proximate result of the Defendants' conduct, Plaintiffs suffered, and will continue to suffer, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent" (Dkt. #12 ¶ 215).

In their Motion to Dismiss, Defendants assert that "Johnson had no involvement in the events that are the basis for [the claims]," and supervisors like Johnson cannot be held liable under § 1983 cases (Dkt. #15 at p. 21).

The Fifth Circuit has held that under § 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability. *Thompkins v. Belt,* 828 F.2d 298, 303 (5th Cir. 1987). Plaintiffs do not allege or identify facts that show Johnson affirmatively participated in any of Steelman's actions. However, a supervisor may be held liable if there exists (1) personal involvement in a constitutional deprivation, (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation, or (3) if supervisory

31

officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation. *See Thompkins,* 828 F.2d at 304; *Terry v. LeBlanc*, 479 F.App'x 644, 646 (5th Cir. 2012). Without personal participation by the official, the Fifth Circuit allows supervisory liability under § 1983 in three circumstances.

The first is where a supervisor "implements unconstitutional policies that causally result in the constitutional injury." *Peña*, 879 F.3d at 620 (citing *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To proceed beyond the pleading stage, a complaint's "description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Peña*, 879 F.3d at 622 (citing *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)).

The second and third are where the supervisor failed to supervise or failed to train the subordinate, and a causal link exists between the failure and the violation of a plaintiff's rights. *See Goodman v. Harris Cnty.,* 571 F.3d 388, 395 (5th Cir. 2009). "[F]or a supervisor to be liable for failure to train, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) (citation omitted). And "for liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Id*.

The three circumstances require a showing that the defendant acted with deliberate indifference. *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action." *Id.* at 446–47, (quoting *Connick,* 563 U.S. at 61). The showing of "deliberate indifference" "under section 1983 . . . 'generally requires that a plaintiff demonstrate at least a pattern of similar violations.'" *Rios v. City of Del Rio, Tex.,* 444 F.3d 417, 427 (5th Cir. 2006) (citing *Johnson v. Deep E. Tex. Reg'l Narcotics,* 379 F.3d 293, 309 (5th Cir. 2004).

### i.   Unconstitutional Policy

Defendants argue that the Amended Complaint provides no showing that "Johnson was deliberately indifferent to the training and supervision, or any policy related to [] Steelman" (Dkt. #15 at p. 24). Plaintiffs allege they will be able to support twenty-three contentions after the aid of some discovery (Dkt. #12 ¶ 108). Plaintiffs' contentions include general statements that Johnson and the County knew their deputies were not provided proper training, routinely incorrectly identified threats, knew their policies did not comport with the standard in the industry, failed to adopt policies that comported with the industry standard, and knew that their shortcomings led to citizens' rights being violated by their deputies.

Here, Plaintiffs claim the Johnson implemented deficient policies and failed to properly train and supervise his deputies (Dkt. #12 ¶¶ 108–12). Specifically, Plaintiffs allege Johnson knew his deputies were not trained regarding the Fourth Amendment and that the policies permitted the unlawful conduct described in the Amended Complaint (Dkt. #12 ¶ 108). As discussed in more detail throughout this order, Plaintiffs' allegations suffice to show that Joi suffered constitutional violations at the hands of the County's employees who were under Johnson's supervision.

The next question is whether Johnson acted with deliberate indifference. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick,* 563 U.S. at 61 (quoting *Bd.*

*of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997).  "To establish that a state actor disregarded a known or obvious consequence of his actions, there must be 'actual or constructive notice' 'that a particular omission in their training program causes . . . employees to violate citizens' constitutional rights' and the actor nevertheless 'choose[s] to retain that program.'" *Porter,* 659 F.3d at 447 (citing *Connick*, 563 U.S. at 61).

Plaintiffs allege that Johnson knew the use of force policies did not comport with the standard in the industry and that the deputies routinely made incorrect use of force decisions that resulted in the violations of citizens' civil rights. (Dkt. #12 ¶ 108). Further, Plaintiffs have alleged that "[d]espite it being plainly obvious to [Johnson] . . . as a result of direct observation, citizen complaints, and/or litigation, that additional or different policies and training would protect the rights of citizens, they decided not to provide the different policies and training to their deputies" (Dkt. #12 ¶ 109). The Amended Complaint provides sufficient facts to show Johnson had notice that his policies resulted in constitutional violations of citizens' rights and chose not to change the policies.

Plaintiffs have stated a plausible claim for the presence of an unconstitutional policy and have adequately allege facts sufficient to survive a Rule 12(b)(6) motion to dismiss. Further, any lack of specificity is of no fault of Plaintiffs because they have not yet had the benefit of discovery. Plaintiffs are bound by Rule 11 to allege only those facts for which they have or will likely have evidentiary support.

Plaintiffs are not required to plead facts "peculiarly within the knowledge of defendants." *Schultea v. Wood*, 47 F.3d 1427, 1434 (5th Cir. 1995); *see also Morgan v. Hubert*, 335 F. App'x 466, 472 (5th Cir. 2009). The facts omitted here are squarely within that category.

In *Morgan*, the Fifth Circuit further clarified how *Schultea* applies to cases dealing with the issue of qualified immunity when a plaintiff has not yet had the benefit of discovery:

> We are mindful that the protection afforded by qualified immunity applies to the lawsuit itself, and not merely to liability, and thus the issue should be resolved as early as possible. See *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994). Thus, we are reluctant to allow the case to proceed to full discovery with important questions regarding qualified immunity left unanswered. *Schultea* points the way forward. We noted [in *Schultea*] the district court's ability to tailor discovery to the defense of qualified immunity: "The district court may . . . limit any necessary discovery to the defense of qualified immunity." 47 F.3d at 1434.

*Morgan*, 335 F. App'x at 472–73. At this point in the early stages of litigation, Plaintiffs have not had the benefit of discovery to aid their side of the case. The Court will not fault Plaintiffs or punish them at the Rule 12(b)(6) stage. Accordingly, with regards to the failure to promulgate policies claim against Johnson, the Court denies Defendants' Motion to Dismiss.

### a.    Qualified Immunity

The Court next turns to the question of whether Johnson is entitled to qualified immunity and asks whether Johnson violated clearly established statutory or constitutional rights. Plaintiffs claim Johnson "enforced a policy that authorized the unlawful forced entry into the home[,]" "enforced a use of force policy that authorized the unlawful force used by [Steelman,]" "enforced a policy that authorized [Steelman's] unlawful statement to law enforcement[,]" and "enforced a policy that authorized retaliatory conduct" (Dkt. #12 ¶¶ 204–08). Further, Plaintiffs have alleged that Johnson has fostered an environment where the deputies feel comfortable violating citizens' constitutional rights (Dkt. #12 ¶ 209).

As discussed above, Plaintiffs did suffer constitutional violations at the hands of Steelman, the rights violated were clearly established, and based on the pleadings, Plaintiffs have alleged facts sufficient to show Johnson's enforcement of unconstitutional policies causally resulted in the constitutional injury. Therefore, the Court finds that Plaintiffs have stated facts, which, if true, are

sufficient to overcome Defendants' qualified immunity defense for the failure to promulgate policy claim against Johnson.

### ii.        Failure to Train and Supervise

Plaintiffs also bring a failure-to-train and supervise claim against Johnson. For a failure-to-train claim, Plaintiffs must allege with specificity how the particular training program was defective. *See Roberts*, 397 F.3d at 293. To begin, Plaintiffs allege Steelman was provided a "16 hour Calibre Press Street Survival class" that "has a reputation of teaching officers to view each incident as a matter of life and death and to act aggressively" (Dkt. #12 ¶¶ 14–15). Plaintiffs further allege Johnson knew that he failed to implement training programs that comported with the standard in the industry including arrest training programs, de-escalation training programs, use of force training programs, and training programs relating to entering people's homes (Dkt. #12 ¶ 108). The Amended Complaint again notes that Johnson knew of the training's shortcomings and chose not to provide different training programs to the deputies (Dkt. #12 ¶ 109). Plaintiffs even allege that Johnson first provided Steelman with de-escalation training a month after the incident with Joi (Dkt. #12 ¶ 112).

The Amended Complaint provides sufficient facts to show that Johnson—similar to the deficient policies discussed above—had notice that his training programs—or lack thereof—resulted in constitutional violations of citizens' rights, which were clearly established, and that he chose not to alter his training. Therefore, the Court finds that Plaintiffs have stated facts, which, if true, are sufficient to withstand Defendants' Motion to Dismiss and overcome Defendants' qualified immunity defense for the failure to supervise or train claim against Johnson.

### b. First Amendment Claim Against Johnson

Under Count V, Joi alleges that Johnson violated her First Amendment rights but does not adequately allege facts to support this assertion. The extent of Joi's allegation against Johnson are as follows:

> [Johnson] had the authority to have [Joi] released from custody, prevent the false criminal charges from being filed, and to withdraw the criminal charges once they were filed, but refused to do so. Instead, [Johnson] published inflammatory statements about how and why the body camera video was circulated seeking to turn public opinion against [Joi] and her family instead of against the [County] and him.

(Dkt. #12 ¶¶ 180–81). Plaintiffs further claim that Johnson published false statements in retaliation for being publicly criticized.

In considering a Rule 12(b)(6) Motion to Dismiss, the Court can consider "any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P.*, 594 F.3d at 387. Plaintiffs reference the news article in their Amended Complaint, and Defendants attached the news article to their Motion to Dismiss (Dkt. #15, Exhibit 1). The news article states in relevant part, "'[t]his video was shared with many, many groups, and it was done for a purpose: Hate Groups, law enforcement hate groups,' Johnson said. 'We've had so many hate emails, so many nasty responses on our sheriff's office Facebook page that I made the decision to take it down.'" (Dkt. #15, Exhibit 1). Based on the Amended Complaint, Plaintiffs provide little support to show that any of Johnson's actions limited Joi's ability to publicly criticize the Sheriff's Office, nor do Plaintiffs describe which of Joi's actions constituted First Amendment speech.

Because the Court has the discretion to address either prong of the qualified immunity analysis first, *Pearson,* 555 U.S. at 232, the Court will start with the second prong. To reiterate, the law may be deemed to be clearly established if a reasonable official would understand that his

conduct violates the asserted right. *Anderson*, 483 U.S. at 640. Here, Plaintiffs provide no caselaw explaining what the law is regarding Johnson making statements to a news source. Even assuming there was a First Amendment violation, a reasonable officer would not have believed that making statements to the news site—regardless of whether the comments were speculative—violated someone's First Amendment right to publicly criticize public officials. Therefore, Johnson is entitled to qualified immunity on the First Amendment claim against him under Count V in the Amended Complaint.

### III.     Count IX Municipal Liability

Defendants claim that Plaintiffs did not plead facts supporting municipal liability under § 1983, that vicarious liability is not recognized in a federal suit against a governmental entity, and that Plaintiffs' factual allegations are conclusory and insufficient. Specifically, Defendants claim Plaintiffs did not plead a county policy and that there were no allegations supporting failure to train and supervise claims.

It is well-settled that a municipality is liable under § 1983 only when an injury is caused by the execution of the government's policy, practice, or custom. *See Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 694 (1978). To establish a municipality's liability, the plaintiff bears the burden of pleading and proving the existence of: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose moving force is the policy, practice, or custom. *See id*. at 691; *Bishop v. Arcuri*, 674 F.3d 456, 467 (5th Cir. 2012). To establish the third element, the plaintiff must show either: "(1) the policy itself violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences[.]" *Johnson*, 379 F.3d at 309 (citation removed). Negligence is insufficient. *Id*.

Generic assertions of municipal liability are also insufficient. *See Wright v. Denison Ind. School Dist.,* 2017 WL 2262778, at *4 (E.D. Tex. May 24, 2017). A plaintiff suing a government entity and claiming that some policy of the entity harmed them "should be able to muster allegations of 'past incidents of misconduct to others, multiple harms that occurred to the plaintiff[s] [themselves], misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy.'" *Id*. (citing *Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d 826, 842 (S.D. Tex. 2011)).

The Fifth Circuit has defined "official policy" as:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 92 (5th Cir. 1992). Governmental policy or custom "usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson*, 588 F.3d at 847 (citations omitted).

A plaintiff must also "specifically identif[y]" the alleged policy, *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001), and where alleging "policy based on a pattern," must show the "pattern . . . occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is expected, accepted practice of . . . employees." *Davidson v. City of Stafford*, 848 F.3d 384, 396

(5th Cir. 2017). "Such 'policy' must derive from the government entity's recognized policy maker[.]" *Wright*, 2017 WL 2262778, at *4.

Here, Plaintiffs claim the County had deficient policies and failed to properly train its officers (Dkt. #12 ¶¶ 108–12). Specifically, Plaintiffs allege the County knew their deputies were not trained on the Fourth Amendment and that the policies permitted the unlawful conduct described in the Amended Complaint (Dkt. #12 ¶ 108). After reviewing the Amended Complaint, Motion to Dismiss, Response, and supplemental authorities, the Court finds that Plaintiffs have stated plausible claims against the County upon which relief could be granted. Therefore, Defendants' Motion to Dismiss is denied as to the claims against the County.

## CONCLUSION

It is therefore **ORDERED** Defendants' Second Motion to Dismiss (Dkt. #15) is hereby **GRANTED in part and DENIED in part.** Specifically, the claims under Count IV and the claim against Johnson under Count V are dismissed. The Motion is denied as to all the remaining claims.

**IT IS SO ORDERED.**

 **SIGNED this 8th day of March, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE